John MANOS, Appellant,

v.

The STATE of Texas, Appellee.

No. B14–82–125CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 17, 1983.

Petition for Discretionary Review Denied
July 13, 1983.

Clyde Woody, Houston, for appellant.

James C. Brough, Jack Frels, Houston, for appellee.

Before PAUL PRESSLER, ROBERTSON and CANNON, JJ.

## OPINION

CANNON, Justice.

Appellant was charged with aggravated robbery. Trial was to a jury which found him guilty and assessed punishment at seventy-five years. We affirm.

The appellant, John Manos, conspired with 20-year-old Donnie McDonough and with Manos' nephew, Michael Kohrhamer, to rob the Carolyn Thompson Antique Jewelry Store in the River Oaks Shopping Center at 2036 West Gray in Houston. Manos told them it would be a piece of cake; it was remote and would be easy to rob because there were only two female employees on duty inside the shop. The appellant was to provide two nine millimeter guns and McDonough and Kohrhamer were to commit the robbery. Appellant Manos did provide two nine millimeter guns to those two people.

On March 15, 1979, Manos, Kohrhamer and McDonough went to a small cafe down the street from the jewelry store. Manos went to the jewelry store first, and returned saying it had a very expensive sapphire piece, a lot of small pieces, and was easy to hit. Then, on direction from Manos,

McDonough went into the jewelry store to check it for security and to see how the display cases were located. McDonough and Kohrhamer planned to go into the store, look at jewelry, separate the two female employees, and rob the store.

The next day, March 16, 1979, Appellant took McDonough and Kohrhamer to the jewelry store. At the time of the robbery, Manos was in an automobile behind the jewelry store. McDonough and Kohrhamer went into the jewelry store and committed the robbery, handcuffing the two women employees at gunpoint with handcuffs purchased by Manos at a pawn shop. The guns were loaded. In addition to the jewelry, Kohrhamer took a billfold from the purse belonging to one of the store's employees, Mrs. Waugh, which was laying on one of the display cases. The billfold contained her driver's license and credit cards. After the robbery, McDonough and Kohrhamer got in the car with Manos and went to Manos' house where they itemized the jewelry, put the jewelry in small bags, tagged it and packed it away.

The day after the robbery, Manos, McDonough and Kohrhamer left Houston by Amtrak train for New York with the nine millimeter guns, the billfold and the jewelry. They planned to sell the jewelry in the diamond exchange. Upon arrival, all three stayed in the same room at a hotel in Manhattan near the diamond exchange.

Manos later met a young woman named Christine, who joined the threesome. They changed hotel rooms and all four people stayed together in one room at the Skyline Motor Inn. After a week and a half, McDonough and Kohrhamer went to Albuquerque, New Mexico, taking the nine millimeter guns. From Albuquerque, McDonough went to California and joined the Army. McDonough turned State's witness and testified in the trial of Manos.

On April 9, 1979, Michael Fenn, the general manager of the Skyline Motor Inn in Manhattan, New York, conducted his routine bag check and inspection of all rooms of the hotel which were on daily pay. The record showed the tenant of Room 542 had not paid for April 9, and it was the practice of the hotel, in such an event, to enter a room after the twelve noon deadline when a guest had been occupying a room and paying his bills on a daily basis.

Having no indication that the guests in Room 542 would stay over, and the advance payment then due not having been made by the noon deadline, Mr. Fenn, at about 12:10 p.m., knocked on the door and announced himself. After receiving no response, he unlocked the door and entered the suite for the purpose of inspection. No guests were present in the room. The parlor was in disarray, lamp shades had been removed, and clothes were scattered. The convertible sofa was open and unmade, and a double bed had been slept in and not made up. A desk drawer was open and a mirror which belonged on the wall above the desk had been removed. Mr. Fenn, still alone in the room, went to put the mirror on the wall. He looked into the open desk drawer and saw several rounds of assorted ammunition, handcuffs, surgical gloves, jewelry tabs and loose change.

The ammunition and the other items in the open desk drawer were in open view. The door of the closet was open, and clothes were on the closet floor. Among the clothing was a black bag with a silencer sticking out, and an open briefcase. In the briefcase he saw a handgun, several pairs of handcuffs, boxes of ammunition of assorted caliber, more surgical gloves, credit cards, bunches of jewelry tags and more plastic jewelry bags. There was an empty Colt .45 case. Mr. Fenn recognized the silencer because he had spent nine years in the National Rifle Club in New Jersey. At this point Mr. Fenn left the room, double locking it so a person with a room key could not enter it, went to the hotel office and called the police.

In response to that call, Officer Signorile arrived at the hotel general manager's office at about 1:45 p.m. Mr. Fenn told him what he had found and took him to Room 542, where Mr. Fenn unlocked the room and showed the officer the open desk drawer and closet. When the officer looked at the

bag containing the gun and silencer it was open. The officer at first thought it was a machine gun, but the silencer was fastened to a .22 revolver. In the bed was a brown leather case containing a .45 caliber automatic. There was visible ammunition for the guns in the suite and there was an empty box for a .357 magnum, but no such gun was seen at that time. There was no nine millimeter gun, but nine millimeter and .357 magnum ammunition were found. Officer Signorile removed the visible weapons and ammunition from the room, and secured them in the hotel's safe, and Mr. Fenn again double locked Room 542.

Later, Officers dressed themselves as hotel employees and conducted surveillance in and around the lobby of the hotel. Officer Signorile was stationed in the lobby. About 6:00 p.m. the appellant got out of an automobile, entered the hotel, and went to the desk. The doorman and desk clerk, by prearranged signs, let Officer Signorile know the appellant was the tenant who had been registered in Room 542, and Officer Signorile arrested the appellant. The officer told the appellant he was under arrest for possession of guns and gave him his *Miranda* warning. Then the officer asked Manos if he was willing to answer questions without an attorney. The appellant replied "What do you want to know?" The officer asked where the .357 and the nine millimeter guns were located. The appellant told him the .357 was up in the closet under the clothes, and the nine millimeter was gone. The officer then went back to Room 542 and, under the clothes in the closet, found the .357 pistol.

At the time of the arrest, the appellant was searched. A key to Room 542 was found on this person and was returned by the officer to Mr. Fenn. Officer Signorile also recovered several pieces of jewelry and some safety deposit box keys from the appellant.

Sections 265.01, 265.02, 265.03 of McKinney's Penal Statutes, of New York, were admitted into evidence in a pre-trial hearing. These statutes indicate that possession of handguns was an offense against the laws of New York. At trial, Manos did not testify; two alibi witnesses testified for the defense.

In his first ground of error, the appellant argues that the trial court erred in admitting State's Exhibit No. 20, an attaché case, into evidence over appellant's objection that it related to an extraneous offense. The appellant's objection was "for all the reasons set forth", and no objection was made that this attache case was involved in an extraneous offense. "An objection must not only identify what is objected to but must set forth the grounds for the objection." *Evans v. State,* 480 S.W.2d 387, 391 (Tex.Cr.App.1972); *Hernandez v. State,* 599 S.W.2d 614, 617 (Tex.Cr.App. 1980) (Opinion on Rehearing). We therefore overrule appellant's first ground of error.

In his second ground of error, appellant contends that it was error to permit the State, over objection, to prejudicially bolster its own witness. As correctly pointed out by the State, the witness had been impeached by cross-examination. Impeachment of a witness is defined in BALLENTINE'S LAW DICTIONARY (3rd Ed.1969) as follows:

> IMPEACHMENT OF WITNESS. An attack on the credibility of a witness by the testimony of other witnesses that the facts about which he has testified are other than as he has stated; by proof that his general reputation is bad; by proof that he has previously made contradictory or inconsistent statements, or by proof of his bias, interest, or hostility. [Cite omitted]. Any means through proof of impairing the credit of the witness, involving matters affecting the general credit of a witness as well as those affecting his credit in the particular case. [Cite omitted]. *Id.* at 585.

Appellant complains that the following series of questions and answers were bolstering:

Q: [By Mr. Frels] So where it says that Defendant Manos makes the statement—

MR. ROTHBLATT: I would object to this. May we have a bench conference, Your Honor?

(The following proceedings are had at the bench out of the hearing of the jury.)

MR. WOODY: We would object to this. He is attempting to bolster his witness, and there are about a thousand cases in point against him. He is well aware of it. This man is making reversible error. He knows he is not allowed to do this under the Code of Criminal Procedure.

MR. FRELS: They have gone into it. They have used this whole line of questioning to impugn his credibility, to legally call him a liar. They have displayed these notes before the jury. I then have a right to develop and to complete this in the record.

\* \* \* \* \* \*

MR. FRELS: The record shows he did talk to Catherine Reid the day after this happened and informed her of the events. Here is the record. Now, the record is left that this statement made by Manos about the finding of the .357, that just didn't happen. I think I have the right to complete the record before this jury as to what actually, factually, and truthfully happened.

MR. ROTHBLATT: We are not arguing that. We did not say that.

THE COURT: As to reading from that report, the objection is sustained. As for his prior statement, the objection would be overruled.

MR. WOODY: To which we object for the reasons we heretofore told the Court as to bolstering and rank hearsay.

\* \* \* \* \* \*

Q: [By Mr. Frels] Concerning the sentence that is underlined, do you recall whether or not [sic] told Catherine Reid these facts?

A: [By Officer Signorile] Yes, I did.

Q: Are these consistent with your recollection about these particular facts?

A: Yes.

Q: You may now tell what you told Catherine Reid concerning those facts included in those two sentences here in what has been marked for identification only as State's No. 22.

Q: I told Ms. Reid that Mr. Manos told me that the gun was up in the closet, and that I went up to the closet where he said it was with Mr. Fenn and recovered the gun.

Defense counsel cross-examined Officer Signorile at length regarding whether he had made any written notes, concerning his arrest of the appellant and what the appellant said to him, to be used in preparation for trial, and after receiving an answer of "No sir," defense counsel then questioned him at length as to why he had not made such notes for use at trial:

Q: Is it possible, Officer Signorile, that one of the reasons you do not make notations of what you observe and what you hear when you place somebody under arrest is because if you have to testify, you might have to produce written proof of what you said?

Appellant's counsel focused upon the statement, which the officer had testified that the appellant had made to him, regarding the location of the .357 magnum pistol:

Q: Why did you want to get that information? Would you tell us why you wanted to get that information?

A: Because I had ammunition for a nine millimeter and a .357 gun. Maybe somebody was going to get hurt with those guns.

Appellant's counsel cross-examined Officer Signorile from notes that had been made by a New York Assistant District Attorney, Catherine Reid, as a result of five conversations which the officer had had with her in regard to the instant arrest. As correctly contended by the State, the witness had been impeached by cross-examination.

There had been different conversations between Officer Signorile and the New York prosecutor who made the notes, and

these notes had been displayed before the jury by appellant's counsel. This constituted proof of part of a statement, which authorized the State to make proof of other parts of the statement to clarify the proof which had been made. TEX.CODE CRIM. PRO.ANN. art. 38.24, (Vernon 1979) states:

When part of an act, declaration of conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also given in evidence.

■ Here, the defense having proved that there were conversations recorded in written notes in which the witness told the New York prosecutor what occurred at the time of the appellant's arrest, it was proper for the State to prove, by the witness' refreshed recollection, just what he told the prosecutor on that subject. *Berry v. State,* 596 S.W.2d 857 (Tex.Cr.App.1980). Furthermore, there was no testimony at all by a third party to bolster the witness' testimony. It was all the witness' own testimony.

■ Still further, the defense, by its cross-examination on the matter of note taking and with its imputation question above quoted, attempted to show that the present testimony of this witness was a recent fabrication; when this is done a former consistent statement can be shown. The question, in context with the other cross-examination, inferred corrupt motives on the officer's part in not taking notes as to what the appellant told him at the time of the arrest. When this is done, prior consistent statements may be shown. Appellant's second ground of error is overruled.

■ In his third ground of error, the appellant argues that the trial court erred in failing to sustain appellant's timely motion to suppress evidence resulting from a warrantless arrest, when there was no probable cause shown for such arrest. Except for the .357 magnum pistol and a nine millimeter gun, all the evidence that was sought to be suppressed was discovered by Mr. Fenn on a routine room check. Before the court, but not the jury, the evidence showed that Mr. Fenn was not acting as an agent for any law enforcement agency. This discovery of evidence by Mr. Fenn was not a search or seizure protected by the Fourth Amendment. *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978).

■ A warrantless arrest was made of the appellant only after identification was made by third persons in the lobby of the Skyline Motor Inn. At this point in time, we find that Officer Signorile had probable cause for the arrest of the appellant and that exigent circumstances existed. *Jones v. State,* 565 S.W.2d 934 (Tex.Cr.App.1978). We therefore overrule appellant's third ground of error.

■ Appellant's fourth ground of error is that the Court erred in failing to sustain appellant's timely motion to suppress evidence obtained as a result of an illegal search. The evidence discovered in the case at bar, except for the .357 magnum pistol, was discovered by Mr. Fenn. Mr. Fenn was on a baggage check of the rooms of the hotel of persons that had been guests of the hotel who were paying on a daily basis who had not paid for another day. At that time, Mr. Fenn was not connected with any government officials. The .357 magnum was discovered only after the appellant was arrested and given his warning. Our conclusion is that the evidence discovered did not constitute an illegal search and seizure subject to the Fourth Amendment of the United States Constitution or the Texas Constitution. *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978), *Eisentrager v. Hocker,* 450 F.2d 490 (9th Cir.1971).

■ Appellant's next contention, in his fifth ground of error, is that the trial court erred in refusing appellant's request to charge upon the defense of alibi, to wit: the charge fails to require the State to

prove beyond a reasonable doubt. The court's charge was as follows:

A defense which is claimed by the Defendant in this case is what is known in law as an alibi; that is, that at the time of the commission of the offense, if any, the defendant was at another and different place from that at which the offense, if any, was committed, and therefore was not and could not have been the person who committed the offense.

If, from the testimony, you find that the Defendant was not present at the time and place of the commission of the offense, if any, or *if the evidence raises in your mind a reasonable doubt that he was present at the time when the offense, if any, was committed, and* in addition thereto;

*You have a reasonable doubt about whether the Defendant,* at a time and place other than the time and place of the commission of the offense, if, any, and *acting with intent to promote or assist in the commission of the offense, if any,* solicited, encouraged, directed, aided, or *attempted to aid Donny McDonough and Michael Kohrhamer to commit the offense, if any,* you will find *the Defendant not guilty.* (Emphasis added.)

The above charge of the Court places the burden upon the State to prove beyond a reasonable doubt. Therefore, we overrule appellant's fifth ground of error.

 Appellant further contends, in his sixth ground of error, that the evidence of the accomplice witness, Donnie Joe McDonough, was not corroborated as a matter of law. The correct rule of law to test the sufficiency of corroboration of an accomplice witness is indicated in *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979):

To test the sufficiency of the corroboration of an accomplice witness, one must eliminate from consideration the evidence of the accomplice witness, and then examine the evidence of the other witnesses to ascertain if it is of *incriminating* character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corrobora-

tion is sufficient; otherwise, it is not. The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. The corroboration need only make the accomplice's testimony more likely than not. *Id.* at 883.

In the case at hand, the appellant was seen at the jewelry store the day before the robbery. While there, he noted a pink ruby ring, which he called a pink sapphire, and related that incorrect information to the accomplice witness, McDonough. McDonough returned to the store approximately 10 minutes later and referred to a pink sapphire. The above was corroborated by Ms. Johnson and Ms. Waugh, clerks in the jewelry store. Ms. Waugh's credit cards and driver's license which were taken during the robbery were found in the appellant's hotel room in New York. This corroborates the testimony of the accomplice witness that they took the stolen property to New York where all three lived until McDonough and Kohrhamer left New York City. The accomplice also testified that when they went to New York City, they all stayed in one room at a hotel near the diamond exchange. The fact that the appellant was registered in a room with two unmade beds, in such a hotel, tends to corroborate the accomplice's testimony.

Jewelry bags like the ones used at Carolyn Thompson's Antique Jewelry Store were found in the appellant's hotel room. Furthermore, tape like that used to tape up Ms. Waugh was found in the appellant's hotel room.

The appellant's statement to Officer Signorile that the nine millimeter gun was gone tended to corroborate the accomplice's testimony that the appellant furnished the nine millimeter guns which were used in the robbery, that they took the guns to New York City, and that the two accomplices then took them when they departed New York. The appellant's reply, by inference, recognized that there had been a nine millimeter gun. We find that the accomplice's testimony was corroborated, and we overrule appellant's sixth ground of error.

The appellant contends in his seventh ground of error that the trial court erred in failing to grant appellant's motion to suppress the evidence for the reason that the search warrant failed to allege that the appellant was or had any control over the items seized. The state did not introduce the evidence obtained by use of the search warrant. The State's Attorney agreed that the state was not going to introduce into evidence any of the jewelry obtained from the two safety deposit boxes by use of a search warrant. The defense attorney, speaking for the appellant agreed, "It is our position, of course, if we get into the merits of that search warrant in New York, that is wasn't any any good, but fortunately that isn't before the Court." Thus, appellant's seventh ground is overruled.

The appellant asserts in his eighth and ninth grounds of error that the procedure used in the pre-trial identification by witnesses Beth Johnson and Cher Waugh, viewed from all the circumstances, was so unnecessarily suggestive as to amount to a denial of due process.

In *Garcia v. State,* 563 S.W.2d 925, 928 (Tex.Cr.App.1978), the court sets out factors to be considered in determining the origin of an in-court identification:

Appellant asserts that the identification procedures which were used were so unnecessarily suggestive and conducive to irreparable mistaken identification as to taint the prosecutrix's in-court identification of appellant, and that the court abused its discretion in permitting the in-court identification. The factors to be considered in determining the origin of an in-court identification are as follows: (1) the prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any pre-lineup identification and the defendant's actual description; (3) any identification of another person prior to the lineup; (4) the identification by picture of the defendant prior to the lineup; (5) failure to identify the defendant on prior occasions; and (6) the lapse of time between the alleged act and the lineup identification. *Thompson v. State,* 480 S.W.2d 624 (Tex.Cr.App. 1972).

From *Clay v. State,* 518 S.W.2d 550, 554 (Tex.Cr.App.1975) we observe the following:

The prosecutrix was called to the police station to view photographs a week after the crime. When presented with photographs, the prosecutrix was advised, "We think we have got your man, but you'll have to pick him out." Appellant contends that this statement constituted a very substantial likelihood of irreparable misidentification. We do not agree. The prosecutrix had an opportunity to view the appellant on two occasions in daylight. The second contact was at varying ranges of closeness for at least fifty minutes. There was nothing such as a mask obstructing the view of the prosecutrix. The prosecutrix' identification of appellant was unwavering.

A hearing was held out of the presence of the jury in accordance with the recommendation made in *Martinez v. State,* Tex.Cr.App., 437 S.W.2d 842, and the trial judge filed written findings that the identification was of independent origin and untainted by any photographs shown prosecutrix by investigating officers. The in-court testimony of the identifying witness is admissible as long as the record clearly reflects that the witness' prior observation of the accused during the offense was sufficient to serve as an independent origin for the in-court identification. *Benson v. State,* Tex.Cr.App., 487 S.W.2d 117; *Ward v. State,* Tex.Cr.App., 474 S.W.2d 471; *Henriksen v. State,* Tex. Cr.App., 500 S.W.2d 491. We find there was ample evidence to support the trial judge's finding.

In the instant case, the photos were shown to witness Johnson and witness Waugh at different times and different places. The officer that presented the photos made no suggestive statements. Both witnesses identified the appellant, from their own independent recollection, as having been at the store on the day before the robbery. Therefore, appellant's grounds of error 8 and 9 are overruled.

Appellant's tenth and eleventh grounds of error are that the trial court erred in failing to quash paragraph one of

the indictment because the indictment does not allege with requisite specificity the description of the alleged offense and that the trial court erred in failing to quash paragraph one of the indictment because the same does not sufficiently describe the property taken as required TEX.CODE CRIM.PRO.ANN. Art 21.09 and Art. 21.03 (Vernon 1966). Everything should be stated in an indictment which is necessary to be proved. TEX.CODE CRIM.PRO.ANN. Art. 21.09 (Vernon 1966). When it becomes necessary to describe property of any kind in an indictment, a general description of the same by name, kind, quality, number and ownership, if known, shall be sufficient. If the property be real estate, its general locality in the county, and the name of the owner, occupant or claimant thereof, shall be a sufficient description of the same. TEX.PENAL CODE ANN. § 29.02 (Vernon 1974) reads as follows:

§ 29.02 Robbery

(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property, he:

(1) intentionally, knowingly, or recklessly causes bodily injury to another; or

(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

In *Earl v. State,* 514 S.W.2d 273 (Tex.Cr. App.1974), the court stated that:

[T]he actual commission of the offense of theft is not prerequisite to commission of a robbery, nor need the victim of the theft or attempted theft and the victim of the robbery be the same. Of course it must be alleged and proven that the alleged offense was committed "in the course of committing a theft" and "with intent to obtain or maintain control of the property" involved in the theft. Although the proof will involve proving up a theft or attempted theft, the elements of the particular theft (see chapter 31, and specifically Secs. 31.02 and 31.03, V.T. C.A. Penal Code) or attempted theft (see Sec. 15.01, V.T.C.A. Penal Code), need not be alleged in the indictment. *Id.* at 274.

The Court of Criminal Appeals has further held that:

Consistent with *Earl v. State, supra,* we have held that an indictment alleging the offense of aggravated robbery need not allege or in any other manner describe the property taken as was required under our former penal code *Ex parte Lucas,* 574 S.W.2d 162 (Tex.Cr.App.1978).

Appellant's tenth and eleventh grounds of error are overruled. *Rohlfing v. State,* 612 S.W.2d 598 (Tex.Cr.App.1981); *Franklin v. State,* 607 S.W.2d 574 (Tex.Cr.App. 1980); and *Ex parte Lucas,* 574 S.W.2d 162 (Tex.Cr.App.1978).

No reversible error has been shown; therefore, all grounds of error are overruled and the judgment of the trial court is affirmed.